**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DANIEL GWYNN,** : | |
|         **Plaintiff,** : | |
| : | **CIVIL ACTION** |
|         **v.** : | **No. 22-4536** |
| : | |
| **PENNSYLVANIA DEPARTMENT OF** : | |
| **CORRECTIONS et al.,** : | |
|         **Defendants.** : | |

**McHUGH, J.**                                                                                                                    **August 4, 2023**

### MEMORANDUM

This is a civil rights action brought by an incarcerated person who alleges that prison officials failed to move him from death row to the general population after he notified them that his death sentence was vacated. Plaintiff never filed a formal grievance regarding this issue, leading Defendants to argue that Plaintiff's claim is barred for failure to exhaust administrative remedies. Having converted the pending motions to dismiss to motions for summary judgment, and having reviewed the factual record, I am constrained to agree with Defendants and enter judgment in their favor.

### I.     Relevant Background

Plaintiff Daniel Gwynn is currently incarcerated at the State Correctional Institution at Phoenix ("SCI Phoenix"). Compl. ¶ 5, ECF 2. Plaintiff was sentenced to death in 1995, and since then has been in custody of Defendant Pennsylvania Department of Corrections ("DOC"). *Id.* ¶¶ 11, 12. For most of this time, Plaintiff was housed in the DOC's Capital Case Unit ("CCU"). *Id.* ¶ 12.

In October 2020, to comply with the Third Circuit's opinion in *Porter v. Pennsylvania Department of Corrections*, 974 F.3d 431 (3d Cir. 2020), DOC officials circulated a memo among the CCU directing anyone in the unit to alert their counselor or unit manager if their death sentence was vacated and they believed they were eligible for release from the CCU. Compl. ¶ 17; Pl.'s Ex. B, ECF 2 at 22. Three months later, in response to Plaintiff's petition for a writ of habeas corpus, Judge Tucker of this Court vacated Plaintiff's death sentence. Compl. ¶ 18; Pl.'s Ex. C, ECF 2 at 24.[1] Pursuant to the DOC's directive, Plaintiff submitted a DC-135A Request to Staff alerting his unit manager that his sentence had been vacated by court order. Compl. ¶ 19; Pl.'s Ex. D, ECF 2 at 26. His unit manager informally responded that the DOC could not remove him from the CCU until it was notified or received a formal record of his sentencing change. Compl. ¶ 20. Several days later, Plaintiff submitted a separate DC-135A Request to Staff to the Superintendent of SCI Phoenix, Defendant Jamie Sorber, informing Sorber of the court order vacating his sentence and asking why he continued to be housed in the CCU despite raising the issue with his unit manager. *Id.* ¶ 21, Pl's Ex. E, ECF 2 at 28.

Plaintiff subsequently filed this lawsuit on November 7, 2022,[2] alleging that Defendants violated his constitutional rights by keeping him in the CCU despite his vacated death sentence. Two weeks later, on November 21, 2022, the DOC moved Plaintiff out of the CCU. ECF 29 at

---

[1] This order vacated only Plaintiff's sentence and did not reach Plaintiff's constitutional claims regarding his underlying conviction. *See* Pl.'s Ex. C, ECF 2 at 24. Plaintiff was granted further habeas relief due to constitutional problems with the guilt phase of his trial on June 8, 2023. *See Gwynn v. Beard*, No. 08-cv-5061, 2023 WL 3898839, at *1 (E.D. Pa. June 8, 2023).

[2] Plaintiff's Complaint was docketed on November 10, 2022, but under the prison mailbox rule, court filings from incarcerated parties are treated as docketed on the date they are mailed. *See Burns. v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998). Because the Complaint is dated November 7, 2022, I will consider it filed on that date.

¶ 71.  Defendants now move to dismiss Plaintiff's claims based on his failure to first exhaust administrative remedies.[3]

## II.     Standard of Review

Motions to dismiss are typically governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  But pursuant to *Paladino v. Newsome*, 885 F.3d 203, 211 (3d Cir. 2018), I gave notice to the parties that I would consider exhaustion in my role as fact finder and converted the motion to dismiss into a motion for summary judgment on the limited grounds of whether Plaintiff exhausted his administrative remedies.  ECF 19. The standard for summary judgment is governed by Fed. R. Civ. P. 56(a), as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion

The Prison Litigation Reform Act of 1995 ("PLRA") prevents incarcerated individuals from filing federal lawsuits regarding prison conditions "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007).  Proper exhaustion requires such an individual to "complete the administrative review process" in compliance with all applicable procedural rules prior to filing suit, including compliance with any relevant deadlines and exhausting any available appeals process.  *See Woodford*, 548 U.S. at 83-84, 88 (holding that an incarcerated individual cannot satisfy the PLRA's exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal).  Exhaustion is mandatory under the PLRA, *Ross v.*

---

[3] Plaintiff requested the appointment of counsel, and this matter was posted on the Court's web portal for pro bono attorneys to consider while the motion to dismiss was pending.  ECF 24.  When no counsel volunteered to assume representation, Mr. Gwynn was granted an extended period within which to answer the motion.  ECF 28.

*Blake*, 578 U.S. 632, 638 (2016), and applies to any suits about prison life, "whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion therefore "constitutes a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time." *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (citation and internal quotation omitted); *see also Small v. Camden County*, 728 F.3d 265, 271 (3d Cir. 2013) (holding that "exhaustion constitutes a preliminary issue for which no right to a jury trial exists").

Defendants argue that because Plaintiff never filed a formal grievance, he failed to exhaust his available remedies and his claims should therefore be dismissed.

### A. Plaintiff failed to file any formal grievances about the DOC's failure to move him from the CCU, as was required to exhaust his claim.

As noted, proper exhaustion requires compliance with the procedural rules of a given prison's grievance procedure. *See Small v. Camden Cnty*., 728 F.3d 265, 272 (3d Cir. 2013) (noting that completing the administrative review process means "substantial" compliance with the prison's grievance procedures). Here, DOC policy encourages individuals in DOC custody to first attempt to resolve issues with staff informally using the DC-135A "Inmate Request to Staff Member" form. DC-ADM 804 at Section 1(A), ECF 22-3 at 4. If this informal request fails to resolve an issue, incarcerated individuals may file an official grievance using the DC-804 "Official Inmate Grievance Form." *Id.* DOC policy also allows an incarcerated individual to appeal a rejected grievance to their facility manager, and if that appeal is also rejected, the individual may appeal for Final Review to the DOC's Chief Grievance Officer. *Id*. at Section 2, ECF 22-3 at 15-23. The grievance process is "intended to deal with a wide range of issues," except for emergency

4

or urgent issues, sexual abuse and harassment, and misconduct charges or placement in administrative custody. *Id.* at Section 1(A), ECF 22-3 at 5.

Plaintiff filed two DC-135A requests to staff at his facility after his sentence was vacated, on January 15 and January 22, 2021. *See* Pl.'s Ex. D and E, ECF 2 at 25-28. Although he was dissatisfied with the staff response to these requests, Plaintiff does not appear to have ever filed a grievance regarding his continued placement in the CCU. In his response to Defendants' Motion, Gwynn asserts that he filed a grievance on February 9, 2021. *See* ECF 29 at ¶ 81. But this is the first time he asserts the existence of such a grievance – despite specifically addressing administrative exhaustion in his complaint – and he fails to provide any evidence, even circumstantial, to verify that he ever filed a grievance on this issue. Indeed, there is no record of any such filing in the DOC's records of grievances that Gwynn submitted during this period. Def.'s Ex. B, ECF 22-4. And his present position that he filed a grievance, advanced for the first time in response to the pending motion, is flatly contradicted by the allegation in his Complaint, where he pleaded his (mistaken) belief that under DOC policy the grievance procedure could not be used to challenge placement in the CCU. Compl. ¶ 40.[4]

Moreover, Mr. Gwynn's mistaken belief regarding what could and could not be handled through the DOC's grievance system is not a valid basis for me to excuse his failure to properly exhaust. Though I have no doubt that Plaintiff genuinely believed that he could not have filed a formal grievance regarding his complaint, an individual's "claim that the grievance system was

---

[4] The provision of DC-ADM 804 that Mr. Gwynn cites to in support of this view only states that issues concerning "placement in administrative custody" cannot be addressed through the grievance system, but placement on death row is not placement in administrative custody. *See* Defs.' Ex. D, DOC Policy 7.5.1 at Section 2(O), ECF 22-6 at 14 (noting that an individual in the CCU may be transferred to administrative custody status).

unavailable to him because he lacked full knowledge of the specifics of the grievance process does not excuse or waive a failure to exhaust administrative remedies." *Graham v. County of Gloucester*, 668 F. Supp. 2d 734, 741 (E.D. Va. 2009) (citing authority from the Third, Sixth, Seventh, Eighth, and Tenth Circuits), *aff'd*, 413 F. App'x 660 (4th Cir. 2011); *see also Chelette v. Harris,* 229 F.3d 684, 688 (8th Cir. 2000) (emphasizing that the PLRA "says nothing about a prisoner's subjective beliefs, logical or otherwise, about the administrative remedies that might be available"). Plaintiff's subjective belief is therefore insufficient to excuse his failure to comply with the PLRA's exhaustion requirement.

### B. The grievance procedure was not "unavailable" to Plaintiff.

Plaintiff argues that, even if he failed to properly exhaust, this was because administrative remedies were "unavailable" to him. While exhaustion is mandatory under the PLRA, courts have recognized that incarcerated plaintiffs need only exhaust "available" remedies. Administrative remedies are "unavailable" in three circumstances: (1) when the administrative process operates as a simple dead end, (2) when it is "so opaque that it becomes, practically speaking, incapable of use," or (3) when prison administrators thwart individuals from using the grievance process "through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-44. None of these circumstances were present here.

First, Mr. Gwynn does not show that the administrative process at his facility operates as a dead end for grievances, or that the process was so opaque that it was incapable of use by incarcerated individuals. The operation of the grievance process is clearly laid out in DC-ADM 804, discussed above. Gwynn offers little evidence to demonstrate that the process was confusing, opaque, or a dead end. And from January 2021 to December 2022, Plaintiff filed approximately ten grievances – several of which were responded to by staff, and one of which Gwynn appealed

– demonstrating that the process was capable of use and not a complete dead end. Def.'s Ex. B, ECF 22-4; *see also* ECF 29 at ¶ 84.

Second, there is little evidence that prison administrators thwarted Plaintiff's use of the grievance process. Precedent certainly establishes that an individual's failure to exhaust may be excused where prison officials deliberately act to thwart an individual's use of the grievance process, such as by deliberately withholding information about the grievance process, *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir. 2003), or threatening an individual with retribution if they file a grievance, *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018). But here, Gwynn's argument that officials thwarted his use of the grievance procedure primarily rests upon his confusion about whether placement in the CCU could be formally grieved or had to be challenged by filing a DC-135A Request to Staff. *See* ECF 29 at 87. This allegedly confusing guidance is simply not the type of "machination" or "misrepresentation" contemplated by past cases excusing incarcerated plaintiffs' failure to exhaust. And as noted above, Gwynn's own lack of knowledge regarding DOC grievance procedures does not excuse or waive a failure to exhaust administrative remedies, *see Graham*, 668 F. Supp. 2d at 741, absent deliberate attempts by officials to confuse him. As such, I cannot find that administrative remedies were "unavailable" to Plaintiff, such that I could excuse his failure to exhaust.

**IV.     Conclusion**

For the reasons set forth above, Defendants' Motion will be granted. An appropriate order follows.

    /s/ Gerald Austin McHugh
United States District Judge